UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| EDWARD SCOTT | CIVIL ACTION |
| VERSUS | NUMBER 12-1882 |
| MICHAEL HAGGERTY, ET AL. | SECTION "L" (3) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### PROCEDURAL HISTORY

This case arises out of an automobile collision which occurred on March 9, 2011. On that date, the Plaintiff, Edward J. Scott, was sitting in the driver's seat of his car, which was in the parking lot of the U.S. Post Office. The Defendant, Michael Haggerty, an employee of Defendant AT&T Services, Inc. ("AT&T"), was operating his vehicle in the same parking lot and attempted to pass the Plaintiff's vehicle on the left when the mirror on his vehicle struck the mirror on the Plaintiff's car. The Plaintiff claims that his vehicle was damaged and he sustained injuries as a result of this incident. The Plaintiff asserts that the collision and resulting injuries and damages were caused by the negligence of the Defendant, Michael Haggerty.

The Defendants claim that the incident only caused damage to the side mirror of the Plaintiff's vehicle, and there is no credible evidence that the Plaintiff sustained any personal injuries.

The Plaintiff filed suit in the Civil District Court in New Orleans. The case was removed to this Court. A bench trial was held on April 22, 2013. The Court has carefully considered the testimony of all witnesses and exhibits entered into evidence during the trial. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court issues the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the

Court adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

## FINDINGS OF FACT

(1)

Shortly after noon on March 9, 2011, Edward Scott, a resident and citizen of Louisiana, was sitting in the driver's seat of his 2008 Chryster Sebring vehicle. The vehicle was parked in the parking lot of the U.S. Postal Office located at 701 Loyola Ave. in New Orleans, Louisiana.

(2)

Edward Scott was reading mail that he had just retrieved from the Post Office.

(3)

At this time, Michael Haggerty, while in the course and scope of his employment with AT&T, was operating his vehicle in the same parking lot and attempted to pass Scott's vehicle. Haggerty is a resident and citizen of Mississippi, and AT&T is a Delaware corporation with its principal place of business in Dallas, Texas.

(4)

Haggerty's vehicle was proceeding very slowly when its passenger side mirror came in contact with the mirror on the driver's side of the Scott vehicle, pushing it against the front of the door and ripping it off the Scott vehicle.

(5)

Scott testified that he did not see the Haggerty vehicle approaching and was startled at the impact and "was flung." He said that the impact caused his body to move back and forth and side to side in a jerky fashion.

(6)

The incident was immediately reported to the Post Office, and a postal police officer came to the scene and took statements from both Scott and Haggerty and rendered a report. The police officer, Officer Van Merceron, testified at trial that he saw the detached mirror on the roadway and did not notice any other damage to the Scott vehicle. He also indicated that no one reported or complained of any injury.

(7)

Thereafter, both Scott and Haggerty walked into the postal building and obtained copies of the statements. Neither complained of any personal injuries.

(8)

Scott returned home, and later that evening, he noticed a pain in his neck and back. He testified that his neck began to stiffen up, and he felt pain in his shoulders.

(9)

The next day, March 10, Scott went to the New Orleans Health Care Center and was examined by Dr. C. Andrew DeAbate. He told the doctor that since the incident on March 9, he was experiencing neck pain, lower back pain, and posterior bilateral leg pain. He indicated that he has difficulty performing his normal daily activities as a result of his pain.

(10)

Scott's past history revealed two previous accidents. The first accident occurred in 2000, in which he injured his back. The second accident occurred approximately four years before, in which he also sustained an injury to his back. Scott reported that he was treated and all symptoms resolved. This was consistent with Scott's testimony at trial.

(11)

Dr. DeAbate's examination revealed that Scott had limitation of motion, tenderness, and muscle spasm in both his neck and low back. Dr. DeAbate's clinical impressions were: "(1) Acute cervical strain, (2) Acute left trapezius muscle strain, (3) Acute sternocleidomasoid muscle strain, (4) Acute lumbar strain, ruled out radiculapathy." The Doctor prescribed moist heat, electromuscular stimulation, and ultrasound to the affected area. He also prescribed muscle relaxants and told Scott to return in one week. Dr. DeAbate opined: "The patient's signs and symptoms are casually related to the motor vehicle accident of March 9, 2011 with a reasonable degree of medical certainty."

(12)

Scott continued to have pain and muscle spasm in his neck and back, and received conservative treatment from Dr. DeAbate at regular intervals through September 10, 2011. Since the treatment was not helping, Dr. DeAbate suggested an MRI and referral to a neurosurgeon.

(13)

On September 22, 2011an MRI was performed on Scott at East Jefferson General Hospital. The MRI revealed the following:

With respect to the cervical spine:

> 1.1-2mm posterior bulging at C2-3,C7-T1,T1-2 discs
> 2. Degenerative narrowing of C3-4disc with near circumferential projection of disc material but no definite focal hernation
> 3. Broadly based central and left posterior hernation at C4-5 disc
> 4. Right central posterior herniation at C5-6
> 5. Central posterior, superior and inferior subligamentous herniation at C6-7.

With respect to the lumbar spine:

> 1. 1-2 mm posterior bulging at L5-S1 without definite disc herniation.
> 2. A defect is demonstrated in the right posterior disc annulus at L4-5 but no definite herniated disc fragment is confirmed.
> 3. Asymmetric prominence of the left posterolateral aspect of the L3-4 disc is considered more likely than not to be actual disc herniation.
> 4. Posterior surfaces of the upper two lumbar discs and the lowest two thoracic discs are within normal limits.

(14)

On October 26, 2011 Scott consulted Dr. L.S. Kewalramani at the Louisiana Physical & Rehabilitation Associates for another opinion.  At the time of the examination Scott complained of  a "constant aching type of pain."  This was reported to radiate along the neck/shoulder angles and intermittently along the upper extremities, more on the right than left, and was aggravated with motion.  On a scale of 1-10, Scott scored his cervical pain as about 6 on good days and 8.5 to 9 on bad days.  Scott scored his lumbar pain as about 3 on good days and 8 on bad days. Dr. Kewalaramani reported that with regard to the cervical region, his examination revealed a partial loss of the lordotic curve and bilateral spasm of the paraspinal muscles along with spasm of the trapezeii more prominent on the right.  He found diffuse tenderness in the cervical region with localization of tenderness at C5, 6,7 spinous processes and corresponding facetal joints bilaterally.  Cervical motion was guarded.  With regard to the lumbar region, the Doctor reported there was partial loss of the lordotic curve and bilateral spasm of the paraspinal muscles.  He found diffuse tenderness in the lumbar region with localization of tenderness at L4,5,S1 and restriction of lumbar motion.  Dr. Kewalramani prescribed medication and moist heat, and indicated that after he had received and reviewed all on Scott's medical records, he would make further recommendations for treatment if necessary.

(15)

On November 16, 2011, Scott returned to Dr. Kewalramani for a follow-up appointment.

Upon examination, the Doctor found that with regard to the lumbar region, there was partial loss of the lordotic curve, increased tissue turgescence (swelling), and bilateral spasm of the paraspinal muscles. With regard to the cervical region, he found partial loss of lordotic curve, increased tissue turgescence (swelling), mild spasm of paraspinal muscles, and diffuse tenderness in the cervical region with localization tenderness at C5,6,7 spinous processes and corresponding facetal joints bilaterally. Dr. Kewalramani reported that Scott continues to be symptomatic and that clinically, he was about the same as he was during the first examination. In addition to recommending that Scott continue to use moist heat, the doctor recommended that he see a neurosurgeon of his choice.

(16)

On May 7, 2012, Scott was examined by Dr. K.E. Vogel, a neurosurgeon, for evaluation of cervical and bilateral shoulder pain as well as lumbosacral and bilateral leg pain. Dr. Vogel's cervical examination revealed a "mild degree limitation of motion in all directions." He also detected a "mild degree of muscle spasm bilaterally." His lumbosacral examination revealed "a mild degree of limitation of motion in all directions with flexion limited to 70 degrees." He also found a "mild degree of muscle spasm bilaterally." Dr. Vogel concluded: "In all medical probability the patient's signs and symptoms are causally related to the accident of March 9, 2011." The Doctor recommended that Scott continue conservative care, including physical therapy and medications. He found that Scott was not disabled from his current employment as a senior minister at a local church.

(17)

Dr. Vogel saw Scott on June 4, July 2, and finally on October 3, 2012. Scott's symptoms and complaints remained the same. Dr. Vogel diagnosed Scott's condition as: "1) Herniated

-6-

cervical disc vs. segmental cervical instability; 2) Herniated lumbar disc vs. segmental lumbosacral instability." Dr. Vogel recommended: "In view of the patient's persistent discomfort and unresponsiveness to conservative therapy, he has offered hospital admission for further evaluation, including cervical myelogram/CAT scan and appropriate care." He concluded that Scott is "a surgical candidate pending his test results."

(18)

As of the time of trial, Scott has not had surgery. He volunteered that he did not have insurance, but he was not asked if he was interested in undergoing surgery, so it is not clear whether he will seek this treatment. In any event, there is no evidence in the record as to the estimated cost of this type of surgery or even whether it will eventually be prescribed, since it is dependent on the test results.

(19)

On January 31, 2013, Scott was examined by Dr. J. Monroe Laborde. Dr. Laborde also reviewed Scott's prior treatment and test results. Based on his examination and review Dr. Laborde concluded:

> Patient having neck and back pain. The patient was in automobile accident March 2011. MRI shows changes consistent with the aging process and does not show evidence of injury, impairment or indication for surgery. Patient does have some evidence of non-organic pain on history and physical examination indicating psychological factors may be causing or magnifying pain. Non-organic pain makes prognosis with surgery poor and is another reason not to operate on this patient. Patient may continue working. Patient may have sustained a soft tissue injury which would heal in a few weeks. Pain beyond a few months after the accident would to a reasonable medical certainty be unrelated to the automobile accident. Patient's pain beyond six months after the accident would be too a high probability related to pre-existing conditions such as arthritis and psychological factors. Treatment for patient's arthritis would be anti-inflammatory medication and

      exercise and non-narcotic medication.  Patient should continue working."

(20)

At trial Scott testified that he was still in pain.  He complained of neck, shoulder, and back pain.  He said his grip is not as strong as before, and he cannot do work around his house, such as yard work or minor repairs.  He also complained of some difficulty sleeping.  His condition has, however, not caused him to lose any wages.  No one other than the Plaintiff, himself, testified as to his condition or activities before, as contrasted to those after, the incident.  An inspection of his car by a damage estimator revealed that his driver side mirror was knocked off, and there was some damage to the front portion of the driver side door, which was apparently caused by the mirror hitting it.  He received from the Defendants' insurer $674.00 for his property damage, which he used to repair his car.  He incurred medical bills in the following amounts:

      Dr. C. Andrew DeAbate: $7,394.00

      East Jefferson Imaging Center: $2,710.00

      Dr. L.S. Kewalramani: $660.00

      Dr. K.E. Vogel: $790.00.

**CONCLUSIONS OF LAW**

(1)

The Court has jurisdiction over this matter by virtue of the amount in controversy and the diversity of citizenship of the parties.  *See* 28 U.S.C. § 1332.  The substantive law is the law of

Louisiana.

(2)

The Louisiana Civil Code provides: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code Art. 2315(A). Moreover, "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill." La. Civ. Code art. 2316. Negligence is the failure to use reasonable care under the circumstances. It is the plaintiff's burden to prove the defendant's negligence and the resultant damages by a preponderance of the evidence. *See Bruce v. State Farm Ins. Co.*, 859 So. 2d 296, 302 (La. App. 2003). In other words, he must prove that it is more probable than not that the defendant was negligent and that his negligence caused the plaintiff's injuries and resulting damages. In this case, Haggerty was clearly negligent. He underestimated the space between his car and Scott's parked vehicle. The undisputed evidence is that Haggerty's side mirror struck the driver-side mirror on Scott's parked vehicle, knocking it against the front of the door and down to the ground. At the time, according to Haggerty's testimony, his vehicle was traveling very slowly. This is supported by the evidence, since there is nothing to indicate that the Scott vehicle was knocked out of position or even caused to move. But Scott testified that he did not see the Haggerty vehicle before the impact, since he was reading his mail. As a result, he was startled by the impact, and his reflexes caused his body to move side to side and forward and back in a jerky fashion. There is no testimony to dispute this movement, and it is a reasonable reaction since the mirror which was ripped off was some one to two feet from Scott's head. But the nature and extent of his injuries and the resultant damages are more difficult to discern and evaluate.

(3)

With regard to property damage, the evidence supports the conclusion that Scott's vehicle was damaged as a result of the impact. His mirror was ripped off, and the weight of the evidence is that it hit the side of the door on its way to the ground and damaged the door. Scott admits that he received "$674 and some cents" and used that amount to have his car repaired, so he is not seeking nor is he entitled to recover any additional amount for property damage.

(4)

The evidence also supports the conclusion that Scott received some personal injury as a result of the impact. Even the Defendants' expert, Dr. Laborde, concedes that Scott "may have sustained a soft tissue injury." But he would have expected any injury to have healed in several weeks, and pain beyond a few months, he opines, would not be related to the accident. However, Dr. Laborde only saw Scott on one occasion, and other than a physical examination, he performed no diagnostic tests. Moreover, his examination was made in anticipation of trial and took place nearly two years after the collision. Finally, according to his testimony, which was presented in the form of his report, he apparently does not dispute that Scott is in pain. He simply attributes it to "arthritis and psychological factors" rather than the collision.

Nevertheless, Scott testified that he was pain free prior to the collision, but since the collision, he has been in pain. His testimony is unrebutted. Moreover, an examination by Dr. DeAbate on March 10, one day after the collision, revealed muscle spasm in Scott's neck and back. Spasm is an objective symptom of an injury. It is an involuntary reaction of the body to trauma. Furthermore, an MRI, an objective test, performed on Scott on September 22, 2011 at East Jefferson Hospital by the hospital radiologist, Dr. Daniel Johnson Jr., indicated some disc pathology in both the cervical and low back region of Scott's spine. Pain is consistent with this

finding.  Dr. Laborde felt this pathology was due to the normal aging process, but whatever it is, there is no evidence that it was painful prior to March 9, 2011.  Dr. DeAbate, who treated Scott from March 10, 2011 until September 10, 2011 and saw him nearly every two weeks during that time, concluded: "The patient's signs and symptoms are causally related to the motor vehicle accident of March 9, 2011 with a reasonable degree of medical certainty."  This was also the opinion of Dr. Kewalramani who treated Scott on several occasions in October and November of 2011.  It was also the opinion of Dr. Vogel, a neurosurgeon, who treated Scott from May 7, 2012 to October 3, 2012.  Dr. Vogel opined: "In all medical probability the patient's signs and symptoms are casually related to the accident of March 9, 2011."  Thus, the overwhelming weight of the evidence supports the conclusion that Scott sustained injuries, with resulting pain in his neck and back, as a result of the impact on March 9, 2011.

(5)

The nature and extent of these injuries and the damages resulting from them, however, are less clear.  Scott received medical treatment from Dr. C. DeAbate, East Jefferson Imaging Center; Dr. L.S. Kewalramani; and Dr. K.E. Vogel.  This treatment was made necessary by the incident on March 9, 2011.  He is, therefore, entitled to recover the cost of this medical treatment in the following amounts:

> Dr. C. Andrew DeAbate: $7,394.00
>
> East Jefferson Imaging Center: $2,710.00
>
> Dr. L.S. Kewalramani: $660.00
>
> Dr. K.E. Vogel: $790.00.

There is nothing in the record to support a claim for future medical.  There is some mention of a possible surgery, but it is dependent on future tests, and there is no testimony indicating that the

plaintiff would seek such surgery.  There is also no evidence of what any future surgery would cost.  In fact, there is no evidence of either the need, type, or cost of any future medical treatment.  To allow future medical expenses based on this record would be entirely speculative and hence not appropriate.

(6)

Nevertheless, the record does support the conclusion that Scott sustained pain and suffering as a result of the March 9 incident.  But to divine the degree or extent of this pain and the appropriate amount for this item of damage based on the record in this case poses a challenge.  In the first place, Scott apparently did not lose any work, since he is not making any past, present, or future wage claim.  Is this because there was no pain or was it not severe enough?  No one addressed this.  In fact, no one, other than the Plaintiff himself, testified as to his condition or activities before as contrasted to after the incident.  The only evidence introduced at trial regarding the extent of the plaintiff's pain and suffering and its effect on his quality of life is the testimony of the Plaintiff himself, and his credibility was placed in jeopardy when under cross examination, it was revealed that he told different versions of how the accident happened and which part of his vehicle was struck.  Scott appears to be a poor historian and not immune to hyperbole.  But the evidence and record do, nevertheless, support the conclusion that Scott was injured in the collision of March 9, 2011 and has some degree of pain as a result.  He is, therefore, entitled to and award for pain and suffering.

(7)

It has been a little over two years since the injury, and Scott still complains of some pain in both his neck and back.  The record and evidence support an award of $60,000 for this pain and suffering.  This amount is consistent with other cases involving similar injuries.  *See, e.g.*,

*Stelly v. Zurich Am. Ins Co.*, 83 So.3d 1225 (La. App. 2012) (lumbar pain for 28 months—$43,000 in general damages); *Whited V. Home Depot U.S.A., Inc.*, 712 So.2d 97 (La. App. 1996) (cervical and lumbar pain and mild bulging disc—$$30,000 in general damages); *Lee v. Alsobrooks*, 712 So.2d 1060 (La. App. 1998) (moderate cervical and lumbar sprain with ruptured disc—$50,000 in general damages); *United Bilt Homes, Inc. v. Schmitt*, 699 So.2d 1167 (La. App 1997) (soft tissue injuries in neck and back—$55,000 in general damages); *Konneker v. Sewerage & Water Bd. of New Orleans*, 703 So.2d 1341 (La. App. 1997) (lower back and neck pain with herniation of C5-6—jury awarded $75,000 in general damages, but trial judge increased it to $110,000).

**CONCLUSION**

On the basis of the above findings of fact and conclusions of law, the Court finds that the Plaintiff, Edward Scott, sustained damages as a result of the negligence of the Defendant, Michael Haggerty, who was acting in the course and scope of his employment with Defendant AT&T.  The Plaintiff is, therefore, entitled to recover the following amounts from these Defendants, in addition to court costs and judicial interest from judicial demand until paid:

        Medical expenses:   $11,554.00
        Pain & suffering:   $60,000.00
                                $71,554.00

-14-

New Orleans, Louisiana, this 30th day of April, 2013.

_____
UNITED STATES DISTRICT JUDGE